The PEOPLE of the State of
Colorado, Complainant,

v.

Russell Edward VIGIL, Attorney–
Respondent.

No. 96SA361.

Supreme Court of Colorado,
En Banc.

Dec. 16, 1996.

Linda Donnelly, Disciplinary Counsel, John S. Gleason, Deputy Disciplinary Counsel, Denver, for Complainant.

Russell Edward Vigil, Denver, Pro Se.

PER CURIAM.

A hearing panel of the supreme court grievance committee approved the findings and recommendations of a hearing board that the respondent in this lawyer discipline proceeding be disbarred. Neither the respondent nor the deputy disciplinary counsel has excepted to the panel's action. We accept the hearing panel's recommendation.

I

The respondent was admitted to practice law in Colorado in 1976. Because he failed to answer the formal complaint filed by the deputy disciplinary counsel, a default was entered against him, and the allegations of fact contained in the complaint were deemed admitted. C.R.C.P. 241.13(b); *People v. Barr,* 855 P.2d 1386, 1386 (Colo.1993). Based on the respondent's default and the evidence presented by the complainant, the board made the following findings.

On June 2, 1992, Melissa Doll was involved in a serious automobile accident. She remained in a coma for about two weeks and

was hospitalized for a total of three months in Colorado and Pennsylvania. She was twenty-four years old. Ms. Doll was incapacitated for several months and she continues to suffer from memory loss and other residual effects of her head injury.

The respondent knew Ms. Doll from the athletic club where she worked. Shortly after the accident, the respondent petitioned the probate court to become Ms. Doll's temporary conservator, after consulting with her father who lived in Pennsylvania. John Doll was ill at the time and could not stay in Colorado to assist his daughter. The respondent did not request that a guardian ad litem be appointed. He was approved as temporary conservator on June 15, 1992. The respondent's petition for appointment requested limited authority to confer with Ms. Doll's employer, negotiate PIP claims with the insurance company, and make initial contact with the insurance companies regarding their liability to Ms. Doll. The respondent's conservatorship was valid until September 15, 1992.

Melissa Doll's brother, Steve, was also a passenger in the car, but he was less seriously injured. The respondent entered into an agreement with the brother to handle his personal injury claim.

In July 1992, the respondent retained James DeRose, his father-in-law and a lawyer, to handle Melissa Doll's personal injury claim. The respondent, on the protected person's behalf, signed a contingent fee agreement which provided that his father-in-law would receive 20% of any settlement amount recovered. The respondent neither obtained nor sought the required court approval to enter into the contingent fee agreement.

The driver's insurance policy had a maximum liability limit of $300,000 per accident, without regard to the number of claimants. Melissa Doll and her brother therefore had to compete for their share of that amount. The respondent eventually settled Steve Doll's claim for $80,000. In September 1992, the respondent's father-in-law settled the protected person's claim for $220,000. DeRose performed limited services to obtain his $44,000 fee, consisting of a brief exchange of correspondence with the insurer. Before the insurer issued the settlement check, but after the respondent's temporary conservatorship had expired, the respondent and John Doll authorized the appointment of DeRose as trustee for Melissa Doll.

DeRose drafted the trust agreement that the respondent signed as conservator to create the trust, without the approval of the court. While the order of temporary conservatorship did not specifically require court approval for such action, the probate court expected the respondent to obtain court approval for extraordinary actions and expenditures. In addition to naming the respondent's father-in-law as trustee, the trust provided that the corpus and income were to be applied by the trustee solely for the benefit of Melissa Doll until her death, until she reached the age of forty, or until the corpus was exhausted. DeRose had "uncontrolled discretion" to make investments, purchase property, to loan, mortgage, lease, acquire or dispose of trust property, and to receive reasonable compensation for his duties as trustee.

The hearing board found, however, that the trust drafted by DeRose did not include language protecting the beneficiary from being disqualified for Medicaid benefits. Because Melissa Doll has no other assets or income, the board concluded that the protection of the trust assets and Medicaid eligibility were major considerations in the creation of the trust and acceptance of a settlement. As a result of these problems in the drafting of the trust signed by the respondent, Melissa Doll became liable to the State of Colorado for Medicaid payments made to her and she was potentially disqualified from receiving further benefits.

About one month after the trust was funded, the respondent's wife received $70,000 from the trust for a mortgage on a commercial building that the respondent uses in part as a law office. The respondent's father-in-

law, the trustee, drafted the note. The respondent and his wife made regular payments on the note until the property was refinanced in summer 1994. The net proceeds from the 1994 sale were deposited into the trust.

DeRose also authorized the use of $73,000 of trust funds for the purchase of the house of respondent's parents. The house was then leased back to the parents for an amount below market value. The respondent's parents failed to make rental payments to the trust for a period of several months, but the trustee brought no enforcement action against respondent's parents.

The respondent signed a Medicaid application which notified him that he was required by law to report any personal injury settlement to the Department of Social Services. Nevertheless, the respondent failed to report the settlement.

Many of Melissa Doll's medical bills that were not covered by insurance were paid by Medicaid. Eighteen months after the respondent's application for Medicaid, social services began to inquire into the case. In April and October 1993, a Colorado Senior Assistant Attorney General sent letters to the respondent regarding the state's claims. The respondent did not reply. The attorney general then sent a demand letter to DeRose for the amount paid by Medicaid on behalf of Melissa Doll. In early March 1994, the respondent and his father-in-law appeared at the attorney general's office to discuss the state's claim. The attorney general noted that the trust drafted by DeRose did not shield the beneficiary from Medicaid collections. Apparently out of sympathy for Melissa Doll, the attorney general agreed to accept $47,000 in full settlement of the Medicaid claims, paid from trust funds. Doll eventually was reimbursed by the state after her subsequent lawyer discovered an error in the calculations.

After the respondent's temporary conservatorship terminated, he continued to perform various legal tasks for Melissa Doll, including communicating with social services

and the Office of the Attorney General about the Medicaid issue.

At no time did the respondent disclose any of the potential or real conflicts of interests to Melissa Doll, nor did he divulge his relationship with DeRose. The respondent did not reveal to the beneficiary of the trust the manner in which he had elected to use her trust funds, including the use of the funds by his relatives.

After the automobile accident, Melissa Doll moved to Pennsylvania to recuperate near her brother and her ill father. Her father died in April 1993. Following her father's death, and having received no funds from the respondent, Ms. Doll was compelled to work as a nanny to earn room and board. She tried many times to contact the respondent, usually without success. When he did talk to her, he did not give her specific details, but told her that the trust funds were tied up in real estate. The respondent never gave her the information necessary for her to ascertain the status of her trust funds.

Sometime during this time period, Melissa Doll gave her permission for another lawyer to investigate the matter. Upon learning the nature of the investments made with her trust funds, the new lawyer filed actions in the probate court and the district court against the respondent and DeRose.

The respondent did not cooperate in the probate matter and he was held in contempt for failing to provide an accounting of Ms. Doll's funds as ordered by the court. The respondent was ordered to pay Ms. Doll's new lawyer $550, but that amount has never been paid. The respondent afterwards moved to recuse the probate judge because of the contempt proceeding and the matter was transferred to another judge. The respondent thereby caused delay in the dissolution of the trust, contrary to Melissa Doll's interests.

The respondent also delayed the civil action. Although ordered to participate in alternative dispute resolution, he waited until the day before the scheduled meeting before

indicating that he could not afford his portion of the fee, and the meeting was canceled. He did not respond to discovery requests and ultimately defaulted. He also filed for bankruptcy shortly before the trial date, resulting in a continuance. The bankruptcy proceeding was later dismissed because the respondent failed to submit required documents. The hearing board found that the respondent's intention in filing the bankruptcy was to delay the civil case.

According to the board, the complainant's expert testified "that the respondent's conduct in representing Ms. Doll was so egregious and wanton as to be considered reckless. The purpose of a conservatorship is to protect the ward, but the respondent's treatment of Ms. Doll was, in effect, abusive." The board states that the expert also testified

> that the respondent intentionally misled the court by failing to have a guardian ad litem appointed, which prevented independent review; by failing to advise the court of a Medicaid issue or repayment; by failing to advise the court of the personal injury settlement which needed to be approved by the court; by failing to provide an accounting to the court; by failing to advise the court, in the petition, of the scope of Ms. Doll's problem; and by failing to seek direction from the court about the matter.

In summary, the hearing board determined that the respondent committed the following acts:

> (1) served as conservator for Ms. Doll while providing legal representation to her brother, with whom Ms. Doll had a conflict of interest regarding the limited assets available for compensation in the automobile accident; (2) borrowed money from Ms. Doll's settlement trust fund, through his wife, to purchase a building; (3) allowed his parents to borrow $73,000 for the purchase of a house; (4) failed to seek or obtain approval of the probate court of the agreement the respondent made with Mr. DeRose to handle Ms. Doll's personal injury matter; (5) failed to seek or obtain court approval of the trust agreement drafted by Mr. DeRose; (6) approved the trust fund document which was negligently drafted and did not protect Ms. Doll's settlement funds from a Medicaid lien; (7) exposed Ms. Doll to unnecessary legal risk by failing to report her personal injury settlement to Medicaid, as mandated by law; (8) continued to represent Ms. Doll after the conservatorship had expired; (9) unnecessarily delayed the progress of the trust dissolution; (10) intentionally obstructed the progress of the civil action filed against the respondent for damages and losses caused by him.

The above conduct occurred before and after the effective date of the Rules of Professional Conduct, January 1, 1993, and violated DR 1–102(A)(5) and R.P.C. 8.4(d) (a lawyer shall not engage in conduct prejudicial to the administration of justice); DR 1–102(A)(6) and R.P.C. 8.4(h) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law); DR 5–101(A) (a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests); DR 5–105(A) (a lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or which would be likely to involve the lawyer in representing differing interests); DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to the lawyer); DR 7–102(A)(3) (a lawyer shall not conceal or knowingly fail to disclose that which the lawyer is required by law to reveal); R.P.C. 4.1(b) (failure to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client); and R.P.C. 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); as well as C.R.C.P. 241.6(3) (misconduct involving any act or

omission violating the highest standards of honesty, justice or morality).

Furthermore, in his response to a list of questions submitted to him the investigative counsel, the respondent misrepresented that the probate judge had provided verbal approval of the trust mechanism, which was not true. The respondent thereby violated R.P.C. 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation); and R.P.C. 8.4(h) (conduct that adversely reflects on fitness to practice).

## II

The hearing panel approved the board's recommendation that the respondent be disbarred, and the respondent has not excepted to the panel's action. As the hearing board noted, this case is similar to *People v. Score,* 760 P.2d 1111, 1112 (Colo.1988), where the attorney-respondent, Gertrude A. Score, was appointed by the probate court as a co-conservator and co-guardian of a mentally incompetent client. In her handling of the estate, Score failed to keep accurate and orderly records of the assets, entered into transactions with the client's estate involving conflicts of interest, and converted the client's property. *Id.* We disbarred Gertrude Score. *Id.* at 1113.

From the standpoint of appropriate discipline in this case, it is not important whether Melissa Doll was herself the respondent's client. The respondent was appointed her temporary conservator as a result of her serious head injury. A " '[c]onservator' means a person who is appointed by a court to manage the estate of a protected person." § 15–10–201(9), 6B C.R.S. (1996 Supp.). A conservator is a fiduciary. § 15–1–103(2), 6B C.R.S. (1987).

In *People v. Sims,* 913 P.2d 526, 526 (Colo.1996), we disbarred William M. Sims for receiving funds into his attorney trust account and then disbursing them in violation of his fiduciary duty. Even though Sims did not consider the victim of his defalcations a client, the court stated:

The respondent's attitude was so cavalier in his dealing with [the victim's] life savings when they were in his attorney trust account; his understanding of his fiduciary duty was so corrupted by his own self-interest; his continuing reassurances in the face of the obvious misappropriation of the funds so unreasonable; his misrepresentations in the civil action and to the Office of Disciplinary Counsel so aggravated; and the injury sustained by the victim so great; that we have concluded that disbarment is the only appropriate result.

*Id.* at 531. In this case, the respondent's handling of the protected person's trust funds as if they belonged to him and his relatives was comparably corrupt and shameful.

The aggravating factors that the board found reinforce our conclusion that disbarment is warranted. The respondent has a history of prior discipline, an aggravating factor under ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ) 9.22(a). He received letters of admonition in 1980, 1984, 1986, 1987, 1990, and 1995. Two of the letters of admonition involved engaging in conflicts of interest. He also received a public censure in 1989 for failing to answer postjudgment interrogatories and neglecting a legal matter. *People v. Vigil,* 779 P.2d 372, 374–75 (Colo.1989).

In addition, the respondent had a dishonest or selfish motive, ABA *Standards* 9.22(b); engaged in a pattern of misconduct, *id.* at 9.22(c); committed multiple offenses, *id.* at 9.22(d); the respondent submitted false evidence, false statements, or engaged in other deceptive practices during the disciplinary process, *id.* at 9.22(f). The respondent has at no time acknowledged the wrongful nature of his conduct, *id.* at 9.22(g). Melissa Doll was entitled to protection in a relationship of trust with the respondent and she was a particularly vulnerable victim, recuperating from a serious head injury and attempting to cope with the sickness and death of her father, *id.* at 9.22(h). Finally, the respondent has substantial experience in the practice of

law, *id.* at 9.22(i). There are no mitigating factors. Accordingly, we accept the panel's and board's recommendations and order that the respondent be disbarred.

### III

It is hereby ordered that Russell Edward Vigil be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective thirty days after this opinion is issued. The respondent is also ordered to pay the cost of this proceeding in the amount of $1,463.30 within thirty days of the date of this opinion to the Supreme Court Grievance Committee, 600 17th Street, Suite 920–S, Denver, Colorado 80202.

SCOTT, J., does not participate.